# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** : | |
| : | |
| **vs.** : | |
| : | |
| : | **3:CR-17-156** |
| **MARK KOMOROSKI** : | **(Mannion, J.)** |
| : | |
| **Defendant** : | |

## DEFENDANT'S SENTENCING MEMORANDUM

Komoroski pled guilty to Count 1 of the Indictment charging him with attempting to evade export controls in violation of 50 U.S.C. 1705 and the Export Administration Regulations by selling a rifle scope while knowing that a required commerce control license would not be obtained from the U.S. Department of Commerce.

## Sentencing Principles

In sentencing a criminal defendant, this Court must adhere to the following three-step sequence. First, it must correctly determine the appropriate sentencing range on the basis of the Sentencing Guidelines. Though advisory, the court must consider the Guidelines and take them into account in imposing sentence. *U.S. v. Booker*, 543 U.S. 220, 264 (2005); *Kimbrough v. U.S.* 552 U.S. 85, 101 (2007) (court may vary from the Guideline ranges based solely on policy considerations, including disagreements with the Guidelines). A court may not automatically presume that a sentence within the applicable Guidelines is reasonable. *U.S. v. Lychock*, 578 F.3d 214 (3rd Cir. 2009).

In determining the appropriate Guideline range, this Court must resolve Komoroski's objection to the Presentence Report which applies a base offense level of 26 rather than 14 under

the Sentencing Guidelines. USSG §2M5.1. The Presentence Report reflects an initial Base Offense Level of 26, reduced to 23 for Acceptance of Responsibility and a Criminal History Category of II. The guideline range would therefore be 51-63 months before the application of any downward departures or variances. If the BOL is 14 (reduced to 12 for Acceptance of Responsibility) then the guideline range would be 12 to 18 months.

Next, the court must apply any Guideline range departures based upon 5H and 5K; and only then, consider all of the 3553(a) factors to determine whether the sentence as requested by the parties is supported. *Lychock*.

## Objections to the Base Offense Level

A base offense level of 14 rather than 26 is applicable under the sentencing guidelines because the attempted export of rifle scopes to Russia without a commerce control license does not implicate national security controls. USSG §2M5.1(a)(1), (2).

United States Sentencing Guideline § 2M5.1 provides guidance for sentencing upon a conviction for violation of export controls. That section provides:

 (a) Base Offense Level (Apply the greater):

> (1) 26, if (A) national security controls or controls relating to the proliferation of nuclear, biological, or chemical weapons or materials were evaded; or (B) the offense involved a financial transaction with a country supporting international terrorism; or

> (2) 14, otherwise.

The term "national security controls" is not directly defined by USSG § 2M5.1, but the intended meaning of the phrase can be gleaned from Application Note 3, which states:

> In addition to the provisions for imprisonment, **50 U.S.C. App. § 2410** [Section 11 of the Export Adminstration Act("EAA")] ***contains provisions for*** criminal fines and ***forfeiture*** as well as civil penalties. The maximum fine for individual defendants is $250,000. In the case of corporations, the maximum fine is five times the value of the exports involved or $1 million, whichever is greater. ***When national security controls are violated, in addition to any other sanction, the defendant is subject to forfeiture of any interest in,***

> *security of, or claim against: any goods or tangible items that were the subject of the violation*; property used to export or attempt to export that was the subject of the violation; and any proceeds obtained directly or indirectly as a result of the violation.

(emphasis supplied). The referenced section 2410(g) (1) describes national security controls as those imposed under 50 U.S.C. App. § 2404 [section 5 of the EAA]:

> Any person who is convicted under subsection (a) or (b) *of a violation of an export control imposed under section 5* of this Act [section 2404 of this Appendix] (or any regulation, order, or license issued with respect to such control) shall, in addition to any other penalty, forfeit to the United States—
>
> > (A) any of that person's interest in, security of, claim against, or property or contractual rights of any kind in the goods or tangible items that were the subject of the violation;

Application Note 3 states that forfeiture is available under Section 11 of the EAA when "national security controls are violated," and section 11 says that forfeiture is available, and only available for, "violation of an export control imposed under section 5 of the [EAA]." That makes clear that the "national security controls" referred to in Application Note 3 and Guideline 2M5.1(a)(1) are those "imposed under section 5" of the EAA, 50 U.S.C. App. § 2404. This distinction is significant because the EAA provides authority under three sections for the imposition of export controls, namely sections 5, 6, and 7, and of those controls, only those imposed under section 5 are national security controls. This means that controls imposed under section 6 for foreign policy reasons and section 7 for short supply reasons are **not** "national security controls" within the meaning of USSG § 2M5.1(a)(1).

The EAA requires, in section 4, the establishment of a "control list." 50 U.S.C. App. § 2403. That list is the Commerce Control List ("CCL") set forth in the Export Administration Regulations. 15 C.F.R. Supplement 1 to Part 774. Sections 5, 6 and 7 of the EAA thereafter establish three separate and discrete bases for imposing export controls on items and placing them on the CCL.

Section 5(a) of the EAA, which is headed "National Security Controls," provides for items to be placed on the "control list" based on national security considerations. 50 U.S.C. App. § 2404(a). It further requires, in section (a)(1), that items put on the list under this section be done so "in consultation with the Secretary of Defense" and, in section (c)(1), that items on the control list designated under section 5 for national security reasons be "clearly identified as being subject to controls under this section."

Section 6 of the EAA, 50 U.S.C. App § 2405, which is headed "Foreign Policy Controls," provides for export controls on goods based on foreign policy." That section states:

> [T]he President may prohibit or curtail the exportation of any goods, technology, or other information subject to the jurisdiction of the United States or exported by any person subject to the jurisdiction of the United States, to the extent necessary to further significantly the foreign policy of the United States or to fulfill its declared international obligations.

Id. at § 2405(a)(1). Controls imposed for foreign policy reasons under section 6 expire "one year after imposition . . . unless extended by the President." Id. at § 2405 (a)(3). Expansion of foreign policy controls requires, and the annual extension of existing controls, requires "consultation with the Congress." *Id.* at § 2405(f)(1).

Finally, section 7 of the EAA, 50 U.S.C. App. § 2406, which is headed "Short Supply Controls," provides the authority for designation of an item on the control list based on economic considerations, namely, where export controls are "necessary to protect the domestic economy from the excessive drain of scarce materials and to reduce the serious inflationary impact of foreign demand." *See* 50 U.S.C. App. § 2402(2)(c). When items are designated under this section, a notice must be published in the Federal Register soliciting public comment on such designation, the impact of that designation and the licensing policy adopted in connection

with such goods.  Id. at § 2406(a)(2).  An example of a control imposed based on short supply is the prohibition of unlicensed export of horses by sea.   15 C.F.R. § 754.5.

When the Export Administration Act was revised in 1979, the legislative history made clear that foreign policy and national security controls were to be seen as separate and distinct bases for control.  The House Committee on Foreign Affairs found that "the distinction between these two types of control has not been adequately made in the past," and made clear that the two types of control "have different purposes and should be governed by different criteria and procedures."  H.R. Rep. No. 96-200, 96th Cong., 1st Sess. 7-8 (1979).  It was for this reason that "sections five and six [of the EAA] then establish separate substantive and procedural rules tailored to each type of control.  K. Abbot: *Linking Trade to Political Goals: Foreign Policy Export Controls in the 1970s and 1980s*, 65 Minn. L. Rev. 739,  at 858 (1980). This legislative history conclusively refutes any argument, such as that forwarded by the Government here that all foreign policy controls are, of necessity, also national security controls.

Thus, it is clear that Sentencing Guideline § 2M5.1(a)(1) does not cover, and make subject to BOL 26,  exports of any and all items subject to export controls and listed on the Commerce Control List.   Rather, it only covers those items designated specifically for national security reasons, which Application Note 3 makes clear are items added to the CCL pursuant to section 5 of the EAA, not those designated pursuant to sections 6 or 7.  Such additions are required to be made in consultation with the Secretary of Defense and clearly identified as designated under section 5 of the EAA.  It does not cover items designated based on foreign policy controls or short supply controls.  Otherwise, of course, transport of horses by sea, which were placed on the CCL for short supply reasons, would be a national security issue and subject to a Base Offense Level of 26!

The rifle scopes which Komoroski admitted to exporting in his guilty plea are classified as ECCN 0A987.   The U.S. reason for control listed in on the CCL for that ECCN is CC or Crime Control.[1]  The Government admits this.  *USG Sentencing Memorandum*, at 11. The regulations are quite clear that riflescopes and all other items which are controlled for crime control reasons are placed on the CCL pursuant to section 6 of the EAA instead of section 5.

First, section 742.7 of the EAR, which sets forth the regulatory framework for export controls on CC-designated items on the CCL, such as the riflescopes at issue here, states:

> In support of U.S. foreign policy to promote the observance of human rights throughout the world, a license is required to export and re-export crime control and detection equipment, related technology and software.

No reference is made to national security.  Instead, the basis is clearly foreign policy and the authority is therefore section 6, not 5, of the EAA.

Second, as is required by section 6(a)(3) of the EAA for foreign policy controls, the Bureau of Industry and Security (BIS) annually extends the controls on CC items, such as ECCN 0A987, in consultation with Congress.  See, e.g., *Effects of Extending Foreign Policy-Based Export Controls Through 2018*, 82 Fed. Reg. 42279 (September 7, 2017)(request for public comment on annual extension of "foreign-policy controls . . . implemented pursuant to  Section 6 of thr [EAA]" and which "apply to a range of . . . items . . . including . . . [c]rime control and detection items (§ 742.7)).  These are not national security controls, covered by Sentencing Guideline 2M5.1(a)(1) because they are not designated as such and are not developed or extended in consultation with the Secretary of Defense as would be required were they

---

[1] FC (Firearms Conventions) and UN (United Nations) are the international bases for control listed for riflescopes covered by ECCN 0A987.   These controls mean that there are international obligations, imposed by the OAS Firearms Convention and the United Nations, on exports of these items.   Because these riflescopes were not destined for an OAS country or a country subject to a UN arms embargo, these control considerations are irrelevant here.   However, because they derive from multilateral obligations, they are clearly based on foreign policy controls covered by section 6 of the EAA.

designated under section 5 of the EAA. When BIS in 2010 changed the descriptions of the optical sighting devices, the public notice of the final rule made clear that optical sighting devices were placed on the CCL pursuant to section 6 of the EAA and no mention was made in the public notice of section 5 at all. *Revisions to the Commerce Control List To Update and Clarify Crime Control License Requirements*, 75 Fed. Reg. 41078, 41081 (July 15, 2010). *See also Crime Control Items: Revisions to the Commerce Control List,* 65 Fed. Reg. 55177 (September 13, 2000) (expanding items subject to crime control on the CCL after consultation with Congress as required under section 6(f) of the EAA but not with the Secretary of Defense as required by section 5 of the EAA for national security controls).

Clearly the controls placed on riflescopes are not national security controls because they are not imposed under section 5 of the EAA, which Application Note 3 makes indisputably clear is the meaning of "national security controls" for purposes of that guideline. Instead they are imposed as foreign policy controls under section 6 of the EAA.[2] That means that the base offense level of 14 under USSG § 2M5.1(a)(2) is applicable.

In an indistinguishable case, *Reclusado v. United States,* 2015 U.S. Dist. LEXIS 178429 (Aug. 20, 2015 C.D. Cal.), the U.S. District Court for the Central District of California, in considering a motion under 28 U.S.C. § 2255, dealt with a nearly identical export violation. The Defendant entered into a plea agreement admitting that he exported "holographic rifle sights to

---

[2] The Government mentions, for reasons that are not entirely clear, that one of the riflescopes at issue "is advertised as being 'designed for the US Army's M4 weapon system" and "[d]esigned to the exact specifications of the United States Marine Corp' to 'provide quick target acquisition at close combat ranges . . .'" If this were true, that rifle scope would be classified as USML Category I(f), which covers "[r]iflescopes manufactured to military specifications." 22 C.F.R. § 121.1. This is, of course, completely inconsistent with the government's position, and the provisions of the indictment in this case, that both scopes are listed on the Commerce Control List and require a Commerce Department License. At no point has the government argued that one of the scopes is USML Cat. I(f) requiring a State Department license. For the government to now claim, based on advertising copy, that one of the scopes is designed to the exact specification of the Marine Corps is flatly inconsistent with the indictment and the remainder of the government's sentencing memorandum.

the Philippines without the required license from the United States Department of Commerce."

*Id.* at *3. In determining the applicable base offense level for this violation, the Government stipulated in a plea agreement that the defendant must be sentenced pursuant to U.S.S.G. § 2M5.1(a)(2). *Plea Agrement,* at 9, *Reclusado v. United States,* 2015 U.S. Dist. LEXIS 178429 (Aug. 20, 2015 C.D. Cal.). Although a base level of 26 was ultimately applied due to other violations, the government argued that the court should "use the offence level for each object of the conspiracy, *including the lower base offense level of 14 for the holographic rifle scopes*[.]" *Reclusado v. United States,* 2015 U.S. Dist. LEXIS 178429 at *32 (Aug. 20, 2015 C.D. Cal.) (emphasis added). In the plea agreement in *Reclusado*, the Government made clear that the reason for a base offense level of 14 was because the rifle scopes at issue were controlled for crime control purposes:

> Based on the Department of Commerce classification of the rifle scopes for crime control purposes (CC1), the parties stipulate under U.S.S.G. Section 2M5.1(a)(1) that the defendant did **not** evade national security controls or controls relating to the proliferation of nuclear, biological, or chemical weapon materials.

*Plea Agreement,* at 9, *Reclusado v. United States,* 2015 U.S. Dist. LEXIS 178429 (Aug. 20, 2015 C.D. Cal.)(emphasis in original). Neither the *Reclusado* court considering the § 2255 motion, nor the court that imposed the sentence under review, challenged the applicability of a base offense level of 14 to riflescopes. Instead both ruled that the grouping rules under USSG § 3D1.4 required a base offense level of 26 because that was the base offense level applicable to AR-15 receiver forgings which the defendant had also conspired to export without the required State Department license. *See also United States v. Kyriacou,* 2:04-cr-00265-JF at 9 (Feb. 7,

2005 E.D. Pa.) (stipulating to offense level 14 for violation of U.S.S.G. § 2M5.1 for the export of night vision devices to Iran).[3]

The Government in its Sentencing Memorandum argues that all "export controls contained in the EAR are national security controls" and thus that all unlicensed exports of items on the CCL are evasions of national security controls covered by Sentencing Guideline 2M5.1(a)(1). USG *Sentencing Memorandum*, at 6. The Government can only make this argument by completely ignoring the legislative framework set forth above. The Government states that the EAA gave the Secretary of Commerce the authority to prohibit exports "to protect the national security, foreign policy and short-supply interests of the United States," citing the aforementioned sections 5, 6 and 7 of the EAA. But the Government then leaps to the conclusion based on this that *all* export controls are national security controls, ignoring, as we demonstrate above, that the EAA established national security, foreign policy and short supply as *separate* bases for control and *imposed different requirements under controls imposed for those three separate reasons*. Worse, under the government's overbroad analysis, the export of horses by sea without a license would be the evasion of a national security control and subject to a Base Offense Level of 26.

The Government's reliance on the extension of the EAA by executive orders issued under the authority of the International Emergency Economic Powers Act ("IEEPA") also does not allow it to reach the conclusion that all export controls under the EAR are "national security controls." The language of that statute, correctly cited by the Government, gives the President

---

[3] The government, however, argues that this case is an "outlier" and that the "agreement was immaterial because the base offense level applicable to other items underlying the conviction was 26. *USG Sentencing Memorandum,* at 12 . However, the fact that the government has found an identical violation to carry a base offense level of 14 is material and should not be ignored by this Court. The Sentencing Guidelines are meant to create "reasonable uniformity in sentencing . . . and proportionality in sentencing." U.S.S.G. § 1.3. Applying a base offense of 26 for a crime identical to that committed by the defendant in *Reclusado*, where a base offense level of 14 was agreed to be applicable, would run contrary to the stated goals of the Sentencing Guidelines.

the authority to issue executive orders "to deal with any unusual and extraordinary threat . . . to the national security, foreign policy, or economy of the United States. 50 U.S.C. § 1701(a). As with parallel language in the EAA establishing separate bases for export controls, the Government once again leaps to the erroneous conclusion that all executive orders under IEEPA are based on national security and that therefore these orders make all controls under the EAR, the regulations passed under the authority of the EAA, national security controls, conveniently ignoring that the statute refers to three bases for action – "national security, foreign policy or economy" – and this no more means that all actions under IEEPA are based on national security any more than it means that all are based on foreign policy.

However, the language of Executive Order 13222 cited by the Government *(USG Sentencing Memorandum*, at 5-6) which extended the EAA after its lapse makes clear that the President did not intend to set aside the structure of the EAA which established three separate bases for export control under the EAA:

> [The President] find[s] that the unrestricted access of foreign parties to U.S. goods and technology and the existence of certain boycott practices of foreign nations, in light of the Export Administration Act of 1979 . . . constitute an unusual and extraordinary threat to the *national security*, foreign policy, and economy of the United States and hereby declare[s] a national emergency with respect to that threat.
>
> [I]n order (a) to exercise the necessary vigilance over exports and activities affecting the *national security* of the United States; (b) to further significantly the foreign policy of the United States, including its policy with respect to cooperation by U.S. persons with certain foreign boycott activities, and to fulfill its international responsibilities; and (c) to protect the domestic economy from the excessive drain of scarce materials and reduce the serious economic impact of foreign demand, it is hereby ordered as follows . . . the provisions of the Export Administration Act of 1979 . . . shall be carried out under this order so as to continue in full force and effect . . . . All rules and regulations issued or continued in effect by the Secretary of Commerce under the authority of the Export Administration Act of 1979 . . . shall, until amended or revoked by the Secretary of Commerce, remain in full force and effect . . . .

Id. at 6 (citing 66 Fed. Reg. 44025 (Aug. 17, 2001))(emphasis as in Sentencing Memorandum). That Executive Order acknowledges that the EAA which it was continuing established three bases for control, not just one, and the Government cannot change that by italicizing national security controls and ignoring the cited foreign policy and short supply controls. Instead, the Executive Order makes abundantly clear that it was not changing or altering the EAA or the EAR promulgated thereunder but was simply extending it so that it remained in full force and effect when and as initially enacted by Congress. This, obviously, retains the structure of the EAA which trifurcates export controls into those based on section 5 (national security), section 6 (crime control) and section 7 (short supply) and means that items designated for crime control reasons are foreign policy controls and not national security controls.[4] The reference to "national security" in the cited language no more means that all export controls are national security controls any more than it means (had the Government italicized "excessive drain of scarce materials") that all export controls are short supply controls.

    The cases cited by the government in its sentencing memorandum have no applicability to Komoroski's case either. All but one of the cases cited by the government involves violations of export control laws related to the export of goods to countries on which an embargo was in

---

[4] The Government's citation of the Export Control Reform Act, 50 U.S.C. §§ 4801 – 4852, passed after the attempted exports in this case and therefore not relevant to it, does not support the position that all export controls are national security controls. The act cites both foreign policy and national security controls as the basis for export controls and the government's italicization of "national security" and not "foreign policy" does not change the fact that under the structure of the EAA, specific controls were based on national security, foreign policy and/or short supply and that not all controls imposed thereunder are national security controls. Importantly section 827 of the ECRA makes clear that

> All delegations, rules, regulations, orders, determinations, licenses, or other forms of administrative action that have been made, issued, conducted, or allowed to become effective under the Export Administration Act of 1979 (as in effect on the day before the date of the enactment of this Act and as continued in effect pursuant to the International Emergency Economic Powers Act), or the Export Administration Regulations, and are in effect as of the date of the enactment of this Act, shall continue in effect according to their terms until modified, superseded, set aside, or revoked under the authority of this subtitle.

50 U.S.C. § 4826(a)

place. *See e.g.*, *United States v. Sairafi*, 472 F. App'x 821 (9th Cir. 2012) (Iran); *United States v. Hanna*, 661 F.3d 271 (6th Cir. 2011) (Iraq); *United States v. Elashyi*, 554 F.3d 480, 508 (5th Cir. 2008) (Syria); *United States v. McKeeve*, 131 F.3d 1, (1st Cir. 1997) (Libya); *United States v. Harb*, 111 F.3d 130 (4th Cir. 1997) (Iraq); *United States v. Sevilla*, 2006 WL 3486872 (N.D. Ill. Nov. 29, 2006) (Iran); *United States v. Min*, 2000 WL 1576890 (S.D.N.Y. Oct. 23, 2000) (North Korea). Unlike the provisions of the EAR which place particular items on the CCL based on the provisions of the EAA establishing three separate bases for control, the portions of the EAR relating to embargoes of particular countries are based on executive orders promulgated under IEEPA or other U.S. laws specifically imposing embargoes on foreign countries, such as the Helms Burton Act or the Iran Sanctions Act, which may arguably involve national security controls in addition to foreign policy or other controls. In contrast, Mr. Komoroski's violation involves an export to Russia, a country which is not subject to an embargo and thus not an evasion of national security controls relating to unlicensed exports to embargoed countries.

Only one of the cases cited by the Government does not involve exports to an embargoed country, namely *United States v. Shetterly*, 971 F.2d 67 (7th Cir. 1992). However, the item exported was designated under the old ECCN 1537A, *Id*. at 69 n.2. This ECCN, according to the EAR in effect at the time, was controlled for national security reasons. See 15 C.F.R. § 799.1 Supp. 1 (1989). This does not justify claiming that an item controlled for crime control (CC) reasons is controlled instead for reasons of national security.

An additional problem with the Government's argument that *any* export violation implicates national security and thus, the higher guideline must always be applied is that this interpretation would render all of USSG 2M5.1(a)(2) superfluous and irrelevant. It would as well render part of USSG § 2M5.1(a)(1) – namely the reference to "controls relating to the

proliferation of nuclear, biological, or chemical weapons or materials" – similarly superfluous and irrelevant.

If all export violations were covered by (a)(1), there would be no need for the USSG to include the lower BOL in (a)(2).  Worse, the result of reading (a)(2) out of the guidelines is that they would impose the same penalty for an unlicensed export of rifle scopes, horses by sea (ECCN 0A980), unprocessed western red cedar (ECCN 1C988), whips (ECCN 0A978) and cattle prods (0A985) -- all exports which should be covered by (a)(2) and have a BOL of 14  -- as would be imposed on an unlicensed export of  dangerous human pathogens such as the anthrax virus (ECCN 1C351), triggered spark gaps used to detonate nuclear weapons (ECCN 3A228)  or materials for reduced observables (stealth technology) used on missiles and rockets (ECCN 1C101), all exports which should clearly be covered by (a)(1) and have a BOL of 26.

Similarly, if all export violations were evasions of national security controls, there would be no need for USSG 2M5.1(a)(1) to reference "controls relating to the proliferation of nuclear, biological, or chemical weapons or materials"  The CCL establishes specific controls based on nuclear nonproliferation (NP), 15 C.F.R. § 742.2, and proliferation of chemical and biological weapons (CB), 15 C.F.R § 742.2.   If the drafters of the USSG thought that violations of all unlicensed exports of items on the CCL were evasions of national security controls there would be no need to reference controls relating to proliferation of chemical, biological and nuclear weapons.

Lastly, if Komoroski had exported the rifle scopes mounted onto rifles, the applicable base offense level would be 14.  *See* U.S.S.G. § 2M5.2(a)(2)(A).  That guideline covers exportations of arms, such as rifles.   It provides a BOL of 14 for the export of two non-fully automatic rifles.   A separate license would not have been required for mounted riflescopes (and

thus no separate export violation would have occurred) under BIS principles that "individual component parts that are physically incorporated" into an item do not require a separate license if "the parts are normal and usual components" and are not "as a device to evade the requirement for a license." Section 770.2(b)(2) of the Export Administration Regulations, 15 C.F.R. § 770.2(b)(2). At issue here are two riflescopes that, had they been mounted to two rifles exported to Russia, would have resulted in a Base Offense Level of 14. The possibility cannot be dismissed that the reason that the undercover agent sought exports of two riflescopes rather than two rifles with the scopes mounted was to argue that the higher BOL of USSG § 2M5.1(a)(1) would apply rather than that of USSG § 2M5.2(a)(2).

For these reasons, this court should sustain Komoroski's objections to the Probation Report applying a BOL of 26 and should instead apply a BOL of 14 under USSG§ 2M5.1(a)(2).

## Factors Warranting a Downward Departure

Komoroski asserts that a downward departure is warranted pursuant to Application Note 2 of USSG 2M5.1 irrespective of whether the BOL is 26 or 14. Note 2 sets forth various factors for the Court to consider in deciding whether to grant a downward departure.[5] These factors include the degree to which national security is threatened, the volume of commerce, the sophistication of any planning and whether there were multiple occurrences. In this instance, there is no evidence indicating that the attempted export of two rifle scopes to Russia without a commerce license actually threatened the national security interests of the United States. As noted, the rifle scopes were controlled for foreign policy (crimes control) and not national security reasons. The volume of commerce was negligible as only two rifle scopes were shipped having a total value of less than $2,500.00. There was no sophisticated planning. The sale was consummated by email between Komoroski and the undercover agents. Komoroski's email

---

[5] The Probation Report at paragraph 62 also indicates that these factors may warrant a departure under 2M5.1.

address was listed as markkomoroski@aol.com. The scopes were shipped by USPS Priority Mail identifying Komoroski's business as the shipper.

For these reasons, a downward departure under the guidelines is warranted.

### Section 3553(a) Factors

The 3553(a) factors justify a substantial downward variance from the guideline range. 18 U.S.C. 3553(a) (1) makes clear that "in determining the particular sentence to be imposed this court shall consider – (1) the nature and circumstances of the offense…" As noted above, the attempted export of two rifle scopes did not threaten the security interests of the United States; and there was no sophisticated planning to sell these scopes. The volume of commerce was negligible having minimal impact on the control of commerce through its licensing process. A downward variance for this reason is warranted.

Section 3553(a)(6) requires this court to avoid unwarranted sentence disparities amongst defendants who have been found guilty of similar conduct. Sentencing Komoroski at a BOL of 26 pursuant to USSG §2M5.1(a)(1) while other defendants who have engaged in nearly identical conduct have been sentenced at a BOL of 14 pursuant to USSG §2M5.1(a)(2) will create an unwarranted disparity. This disparity would be contrary to the sentencing guidelines policy of achieving "reasonable uniformity in sentencing by narrowing the wide disparity in sentences imposed for similar criminal offenses committed by similar defendants." USSG Ch. 1, Part A 3. Other defendants found guilty of conduct nearly identical to Komoroski's were sentenced under USSG §2M5.1(a)(2). See as discussed above, *Reclusado v. United States,* 2015 U.S. Dist. LEXIS 178429 (Aug. 20, 2015 C.D. Cal.) where the court dealt with a plea agreement in which the exportation of holographic rifle sights to the Philippines without the required commerce control license had a BOL of 14 *Id.*at *3, 9. The plea agreement in *Reclusado* makes clear that the

reason for a BOL of 14 was because the rifle scopes at issue were controlled for crime control purposes. *Id.*at *9. *See also United States v. Kyriacou,* 2:04-cr-00265-JF at 9 (Feb. 7, 2005 E.D. Pa.) (stipulating to offense level of 14 for violation of U.S.S.G. § 2M5.1 for the export of night vision devices to Iran).

There are also policy considerations justifying a downward variance in the event this court decides that a BOL of 26 under U.S.S.G. § 2M5.1(a)(1) applies. A sentencing court is allowed to impose a sentence that varies from the Guidelines based solely on policy considerations. *Lychock*, 578 F.3d at 219-220.

Komoroski's commerce licensing violation is pale in comparison to export violations involving the proliferation of nuclear, biological or chemical weapons or military technologies which significantly threaten national security as identified in U.S.S.G. § 2M5.1(a)(1). Yet to subject both types of violations to the same level of punishment would undermine the policy of having an equitable and fair sentencing system and be contrary to the sentencing objectives of section 3553(a)(2)(A). Imposing the same level of punishment for both types of violations would neither be just nor reflect the seriousness of each offense. And, subjecting Komoroski to such punishment would be far greater than necessary to accomplish the goals of sentencing. *Kimborough v. United States*, 552 U.S. 85 (2007).

Consideration should also be given to the impact that Komoroski's incarceration will have on his immediate family as reflective of his characteristics under section 3553(a)(1). Komoroski has submitted sentencing letters from his immediate family. These letters show that there will be a direct and substantial loss of caretaking and financial support to his family in the event Komoroski is incarcerated for any lengthy period.

**Imposition of a Term of Imprisonment**

If this court concludes that a BOL of 14 under 2M5.1(a)(2) is applicable and Komoroski receives a 2 level downward departure for acceptance of responsibility, the Guideline Sentence will fall within Zone C, before the application of any other departures or variances. If the Guideline range stays within Zone C, the minimum term may be satisfied by a "term of imprisonment that includes a term of supervised release with a condition that substitutes community confinement or home detention providing at least one-half of the minimum term is satisfied by imprisonment." U.S.S.G. § 5C1.1(d)(2). Absent further departures or variances, Komoroski would request that his term of imprisonment includes a term of supervised release with a condition that substitutes home confinement for one-half of the minimum term of imprisonment.

Assuming further downward departures or variances are warranted, the Guideline Sentence will easily fall within Zone B. Under this circumstance, Komoroski would request a sentence of probation that includes a condition that substitutes home detention for imprisonment. U.S.S.G. § 5C1.1(c) (3).

/s/ Al Flora, Jr.
Al Flora, Jr., Esq.
Robert Clifton Burns, Esq.
Counsel for Defendant