# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **No. 3:17-cr-156** |
| | : | |
| **v.** | : | **(Judge Mannion)** |
| | : | |
| **MARK KOMOROSKI,** | : | |
| **Defendant.** | : | **Electronically filed** |

## UNITED STATES' BRIEF IN OPPOSITION TO EMERGENCY MOTION FOR COMPASSIONATE RELEASE PURSUANT TO 18 U.S.C. § 3582(c)

Defendant Mark Komoroski has filed a motion asking the Court to reduce his sentence of imprisonment under 18 U.S.C. § 3582(c)(1)(A) and order his immediate release, relying in part on the threat posed by the COVID-19 pandemic. The Government respectfully opposes the motion. The Court should deny the motion without prejudice for Komoroski's failure to exhaust administrative remedies. Should the Court reach the merits, it should deny the motion with prejudice because Komoroski has not met his burden of establishing that a sentence reduction is warranted under the statute. The Court should also deny Komoroski's alternative request for an order directing BOP to transfer him to home confinement.

## BACKGROUND

Komoroski was convicted of attempting to export a riflescope to Russia without obtaining the required license, in violation of 50 U.S.C. § 1705 and related regulations. The Court sentenced him to 7 months' imprisonment and 2 years' supervised release. Doc. 67. Komoroski was committed to BOP custody on March 6, 2020, and his projected release date is October 4, 2020. Komoroski has moved under 18 U.S.C. § 3582(c)(1)(A) for a sentence reduction resulting in his immediate release from the custody of the Bureau of Prisons (BOP), relying on the threat posed by the COVID-19 pandemic.

## I.    BOP's Response to the COVID-19 Pandemic

As this Court is well aware, COVID-19 is an extremely dangerous illness that has caused many deaths in the United States in a short period of time and that has resulted in massive disruption to our society and economy. In response to the pandemic, BOP has taken significant measures to protect the health of the inmates in its charge.

BOP has explained that "maintaining safety and security of [BOP] institutions is [BOP's] highest priority." BOP, Updates to BOP COVID-

Case 3:17-cr-00156-MEM   Document 77   Filed 05/28/20   Page 3 of 27

19 Action Plan: Inmate Movement (Mar. 19, 2020), available at

https://www.bop.gov/resources/news/20200319_covid19_update.jsp.

Indeed, BOP has had a Pandemic Influenza Plan in place since

2012. BOP Health Services Division, Pandemic Influenza Plan-Module

1: Surveillance and Infection Control (Oct. 2012), available at

https://www.bop.gov/resources/pdfs/pan_flu_module_1.pdf. That protocol

is lengthy and detailed, establishing a multi-phase framework requiring

BOP facilities to begin preparations when there is first a "[s]uspected

human outbreak overseas." *Id*. at i. The plan addresses social

distancing, hygienic and cleaning protocols, and the quarantining and

treatment of symptomatic inmates.

Consistent with that plan, BOP began planning for potential

coronavirus transmissions in January. At that time, the agency

established a working group to develop policies in consultation with

subject matter experts in the Centers for Disease Control, including by

reviewing guidance from the World Health Organization.

On March 13, 2020, BOP began to modify its operations, in

accordance with its Coronavirus (COVID-19) Action Plan ("Action

Plan"), to minimize the risk of COVID-19 transmission into and inside

19 Action Plan: Inmate Movement (Mar. 19, 2020), available at

https://www.bop.gov/resources/news/20200319_covid19_update.jsp.

Indeed, BOP has had a Pandemic Influenza Plan in place since

2012. BOP Health Services Division, Pandemic Influenza Plan-Module

1: Surveillance and Infection Control (Oct. 2012), available at

https://www.bop.gov/resources/pdfs/pan_flu_module_1.pdf. That protocol

is lengthy and detailed, establishing a multi-phase framework requiring

BOP facilities to begin preparations when there is first a "[s]uspected

human outbreak overseas." *Id*. at i. The plan addresses social

distancing, hygienic and cleaning protocols, and the quarantining and

treatment of symptomatic inmates.

Consistent with that plan, BOP began planning for potential

coronavirus transmissions in January. At that time, the agency

established a working group to develop policies in consultation with

subject matter experts in the Centers for Disease Control, including by

reviewing guidance from the World Health Organization.

On March 13, 2020, BOP began to modify its operations, in

accordance with its Coronavirus (COVID-19) Action Plan ("Action

Plan"), to minimize the risk of COVID-19 transmission into and inside

its facilities. Since that time, as events require, BOP has repeatedly revised the Action Plan to address the crisis.

BOP's operations—including the operations at FCI Schuylkill, where Komoroski is incarcerated—are presently governed by Phase Seven of the Action Plan. The current modified operations plan requires that all inmates in every BOP institution be secured in their assigned cells/quarters, in order to stop any spread of the disease. Only limited group gathering is afforded, with attention to social distancing to the extent possible, to facilitate commissary, laundry, showers, telephone, and computer access. Further, BOP has severely limited the movement of inmates and detainees among its facilities. Though there will be exceptions for medical treatment and similar exigencies, this step as well will limit transmissions of the disease. Likewise, all official staff travel has been cancelled, as has most staff training.

All staff and inmates have been and will continue to be issued face masks and strongly encouraged to wear an appropriate face covering when in public areas when social distancing cannot be achieved.

Every newly admitted inmate is screened for COVID-19 exposure risk factors and symptoms. Asymptomatic inmates with risk of exposure

4

are placed in quarantine for a minimum of 14 days or until cleared by medical staff. Symptomatic inmates are placed in isolation until they test negative for COVID-19 or are cleared by medical staff as meeting CDC criteria for release from isolation. In addition, in areas with sustained community transmission, all facility staff are screened for symptoms. Staff registering a temperature of 100.4 degrees Fahrenheit or higher are barred from the facility on that basis alone. A staff member with a stuffy or runny nose can be placed on leave by a medical officer.

Contractor access to BOP facilities is restricted to only those performing essential services (e.g. medical or mental health care, religious, etc.) or those who perform necessary maintenance on essential systems. All volunteer visits are suspended absent authorization by the Deputy Director of BOP. Any contractor or volunteer who requires access will be screened for symptoms and risk factors.

Social and legal visits were stopped as of March 13, and remain suspended at this time, to limit the number of people entering the facility and interacting with inmates. In order to ensure that familial relationships are maintained throughout this disruption, BOP has

5

increased detainees' telephone allowance to 500 minutes per month. Tours of facilities are also suspended. Legal visits will be permitted on a case-by-case basis after the attorney has been screened for infection in accordance with the screening protocols for prison staff.

Further details and updates of BOP's modified operations are available to the public on the BOP website at a regularly updated resource page: www.bop.gov/coronavirus/index.jsp.

In addition, in an effort to relieve the strain on BOP facilities and assist inmates who are most vulnerable to the disease and pose the least threat to the community, BOP is exercising greater authority to designate inmates for home confinement. On March 26, 2020, the Attorney General directed the Director of the Bureau of Prisons, upon considering the totality of the circumstances concerning each inmate, to prioritize the use of statutory authority to place prisoners in home confinement. That authority includes the ability to place an inmate in home confinement during the last six months or 10% of a sentence, whichever is shorter, *see* 18 U.S.C. § 3624(c)(2), and to move to home confinement those elderly and terminally ill inmates specified in 34 U.S.C. § 60541(g). Congress has also acted to enhance BOP's flexibility

6

to respond to the pandemic. Under the Coronavirus Aid, Relief, and Economic Security Act, enacted on March 27, 2020, BOP may "lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement" if the Attorney General finds that emergency conditions will materially affect the functioning of BOP. Pub. L. No. 116-136, § 12003(b)(2), 134 Stat. 281, 516 (to be codified at 18 U.S.C. § 3621 note). On April 3, 2020, the Attorney General gave the Director of BOP the authority to exercise this discretion, beginning at the facilities that thus far have seen the greatest incidence of coronavirus transmission. As of this filing, BOP has transferred 3,311 inmates to home confinement, which is an increase of 116% since March 2020. *See* Federal Bureau of Prisons, *COVID-19 Home Confinement Information*, *at* https://www.bop.gov/coronavirus/.

Taken together, all of these measures are designed to mitigate sharply the risks of COVID-19 transmission in a BOP institution. BOP has pledged to continue monitoring the pandemic and to adjust its practices as necessary to maintain the safety of prison staff and inmates while also fulfilling its mandate of incarcerating all persons sentenced or detained based on judicial orders.

Unfortunately and inevitably, some inmates have become ill, and more likely will in the weeks ahead. But BOP must consider its concern for the health of its inmates and staff alongside other critical considerations. For example, notwithstanding the current pandemic crisis, BOP must carry out its charge to incarcerate sentenced criminals to protect the public. It must consider the effect of a mass release on the safety and health of both the inmate population and the citizenry. It must marshal its resources to care for inmates in the most efficient and beneficial manner possible. It must assess release plans, which are essential to ensure that a defendant has a safe place to live and access to health care in these difficult times. And it must consider myriad other factors, including the availability of both transportation for inmates (at a time that interstate transportation services often used by released inmates are providing reduced service), and supervision of inmates once released (at a time that the Probation Office has necessarily cut back on home visits and supervision).

## II.    Komoroski's Request for a Sentence Reduction

Komoroski is incarcerated at FCI Schuylkill in Minersville, Pennsylvania. That institution has had no reported inmate or staff cases of COVID-19. Federal Bureau of Prisons, *COVID-19 Cases*, *at* https://www.bop.gov/coronavirus/.

As reflected in an attachment to Komoroski's present motion, he submitted a request to the warden for Compassionate Release/Reduction in Sentence on March 26, 2020. Doc. 75, at 16. The request was based on "severe breathing conditions." *Id.* The warden denied that request on April 21, 2020. *Id.* Komoroski has not appealed the warden's denial through the BOP's administrative-remedy process.

On April 29, 2020, Komoroski filed a motion with the Court seeking compassionate release under 18 U.S.C. § 3582(c)(1)(A) on the ground that his chronic sleep apnea makes him particularly vulnerable to becoming seriously ill from COVID-19.  Doc. 75, at 2.

### LEGAL FRAMEWORK

Under 18 U.S.C. § 3582(c)(1)(A), this Court may, in certain circumstances, grant a defendant's motion to reduce his or her term of imprisonment. Before filing that motion, however, the defendant must

first request that BOP file such a motion on his or her behalf.
§ 3582(c)(1)(A). A court may grant the defendant's own motion for a
reduction in his sentence only if the motion was filed "after the
defendant has fully exhausted all administrative rights to appeal a
failure of the Bureau of Prisons to bring a motion on the defendant's
behalf or the lapse of 30 days from the receipt of such a request by the
warden of the defendant's facility, whichever is earlier." *Id.*

If that exhaustion requirement is met, a court may reduce the
defendant's term of imprisonment "after considering the factors set
forth in [18 U.S.C. § 3553(a)]" if the Court finds, as relevant here, that
(i) "extraordinary and compelling reasons warrant such a reduction"
and (ii) "such a reduction is consistent with applicable policy statements
issued by the Sentencing Commission." § 3582(c)(1)(A)(i). As the
movant, the defendant bears the burden to establish that he or she is
eligible for a sentence reduction. *United States v. Jones*, 836 F.3d 896,
899 (8th Cir. 2016); *United States v. Green*, 764 F.3d 1352, 1356 (11th
Cir. 2014).

The Sentencing Commission has issued a policy statement
addressing reduction of sentences under § 3582(c)(1)(A). As relevant

here, the policy statement provides that a court may reduce the term of imprisonment after considering the § 3553(a) factors if the Court finds that (i) "extraordinary and compelling reasons warrant the reduction"; (ii) "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)"; and (iii) "the reduction is consistent with this policy statement." USSG § 1B1.13.[1]

The policy statement includes an application note that specifies the types of medical conditions that qualify as "extraordinary and compelling reasons." First, that standard is met if the defendant is "suffering from a terminal illness," such as "metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease,

---

[1] The policy statement refers only to motions filed by the BOP Director. That is because the policy statement was last amended on November 1, 2018, and until the enactment of the First Step Act on December 21, 2018, defendants were not entitled to file motions under § 3582(c). *See* First Step Act of 2018, Pub. L. No. 115-391, § 603(b), 132 Stat. 5194, 5239; *cf.* 18 U.S.C. § 3582(c) (2012). In light of the statutory command that any sentence reduction be "consistent with applicable policy statements issued by the Sentencing Commission," § 3582(c)(1)(A)(ii), and the lack of any plausible reason to treat motions filed by defendants differently from motions filed by BOP, the policy statement applies to motions filed by defendants as well.

[or] advanced dementia." USSG § 1B1.13, cmt. n.1(A)(i). Second, the

standard is met if the defendant is:

> (I) suffering from a serious physical or medical condition,
>
> (II) suffering from a serious functional or cognitive impairment, or
>
> (III) experiencing deteriorating physical or mental health because of the aging process,
>
> that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

USSG § 1B1.13, cmt. n.1(A)(ii). The application note also sets out other

conditions and characteristics that qualify as "extraordinary and

compelling reasons" related to the defendant's age and family

circumstances. USSG § 1B1.13, cmt. n.1(B)-(C). Finally, the note

recognizes the possibility that BOP could identify other grounds that

amount to "extraordinary and compelling reasons." USSG § 1B1.13,

cmt. n.1(D).

## ARGUMENT

The Court should deny Komoroski's motion for a reduction in his

sentence without prejudice because he has failed to exhaust

administrative remedies. Should the Court reach the merits of his

motion, the Court should deny it with prejudice on either of two independently sufficient grounds. First, Komoroski has not established that "extraordinary and compelling reasons" support a sentence reduction; second, Komoroski has not met his burden to show that a reduction is warranted in light of the relevant § 3553(a) factors. In addition, this Court lacks statutory authority to grant Komoroski's alternative request to direct BOP to transfer him to home confinement.

## I.   This Court Should Deny the Motion Without Prejudice Because Komoroski Has Not Exhausted Administrative Remedies.

Section 3582(c) provides that a defendant's compassionate-release motion cannot be entertained by a court until "the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier . . . ." § 3582(c)(1)(A). This exhaustion requirement is mandatory and must be enforced by the Court. "'[A] judgment of conviction that includes [a sentence of imprisonment] constitutes a final judgment' and may not be modified by a district court except in limited circumstances." *Dillon v. United States*, 560 U.S. 817,

824 (2010). As the Supreme Court has recognized, finality is an important attribute of criminal judgments, and one "essential to the operation of our criminal justice system." *Teague v. Lane*, 489 U.S. 288, 309 (1989) (plurality opinion). Accordingly, it is well established that once a district court has pronounced sentence and the sentence becomes final, the court has no inherent authority to reconsider or alter that sentence. Rather, it may do so only if authorized by statute. *See, e.g.*, *United States v. Addonizio*, 442 U.S. 178, 189 & n.16 (1979); *United States v. Washington*, 549 F.3d 905, 917 (3d Cir. 2008); *United States v. Smartt*, 129 F.3d 539, 540 (10th Cir. 1997) ("A district court does not have inherent authority to modify a previously imposed sentence; it may do so only pursuant to statutory authorization.") (internal quotation marks omitted).

Although Komoroski, as noted above, presented a request to the warden and the warden denied that request within 30 days, Komoroski has not pursued an appeal through the BOP's administrative-remedy process. As this Court has previously concluded, to properly exhaust under the § 3582(c)(1)(A), the inmate must appeal the warden's denial through the administrative process. *E.g.*, *United States v. Moore-*

14

*Brown*, 2020 WL 2306855, at *3 (M.D. Pa. May 8, 2020) (Mannion, J.)

("[E]ven if defendant received a negative response from the Warden, it

is apparent that he has not appealed any such decision.").[2]  The Court

should therefore deny Komoroski's motion without prejudice based on

his failure to exhaust.

## II.  Should The Court Reach the Merits, It Should Deny The Motion Because Komoroski Has Failed to Present Any "Extraordinary and Compelling Reasons" Warranting a Sentence Reduction and Because the § 3553(a) Factors Weigh Against Release.

Even if this Court had authority to grant Komoroski's motion for a

reduction of his sentence, it should be denied for two reasons. First,

Komoroski has not identified "extraordinary and compelling reasons"

for that reduction within the meaning of § 3582(c)(1)(A) and the

---

[2] In certain cases, the Government has conceded that § 3582(c)(1)(A)'s exhaustion requirement is satisfied when (as here) a defendant's request is denied by the warden within 30 days of receipt and 30 days have passed since the warden's receipt. The Department of Justice is currently reviewing its position on this issue. If, during the pendency of Komoroski's motion, undersigned counsel learns that the Department has completed its review and that the Department's position would support a finding of exhaustion in this case, then counsel will notify the Court.

Sentencing Commission's policy statement. Second, the statutory sentencing factors do not weigh in favor of Komoroski's release.

## A. Komoroski Has Not Identified "Extraordinary and Compelling Reasons" for a Sentence Reduction.

Komoroski's request for a sentence reduction should be denied because he has not demonstrated "extraordinary and compelling reasons" warranting release. As explained above, under the relevant provision of § 3582(c), a court can grant a sentence reduction only if it determines that "extraordinary and compelling reasons" justify the reduction and that "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A)(i). The Sentencing Commission's policy statement defines "extraordinary and compelling reasons" to include, as relevant here, certain specified categories of medical conditions. USSG § 1B1.13, cmt. n.1(A).

For that reason, to state a cognizable basis for a sentence reduction based on a medical condition, a defendant first must establish that his condition falls within one of the categories listed in the policy statement. Those categories include, as particularly relevant here, (i)

16

any terminal illness, and (ii) any "serious physical or medical condition .

. . that substantially diminishes the ability of the defendant to provide

self-care within the environment of a correctional facility and from

which he or she is not expected to recover." USSG 1B1.13, cmt. n.1(A). If

a defendant's medical condition does not fall within one of the

categories specified in the application note (and no other part of the

application note applies), his or her motion must be denied.

The mere existence of the COVID-19 pandemic, which poses a

general threat to every non-immune person in the country, does not fall

into either of those categories and therefore could not alone provide a

basis for a sentence reduction. The categories encompass specific

serious medical conditions afflicting an individual inmate, not

generalized threats to the entire population. As the Third Circuit has

held, "the mere existence of COVID-19 in society and the possibility

that it may spread to a particular prison alone cannot independently

justify compassionate release." *United States v. Raia*, 954 F.3d 594, 597

(3d Cir. 2020); *see also United States v. Eberhart*, 2020 WL 1450745, at

*2 (N.D. Cal. Mar. 25, 2020) ("a reduction of sentence due solely to

concerns about the spread of COVID-19 is not consistent with the

applicable policy statement of the Sentencing Commission as required

by § 3582(c)(1)(A).").[3] To classify COVID-19 as an extraordinary and

compelling reason would not only be inconsistent with the text of the

statute and the policy statement, but would be detrimental to BOP's

organized and comprehensive anti-COVID-19 regimens, could result in

the scattershot treatment of inmates, and would undercut the strict

criteria BOP employs to determine individual inmates' eligibility for

sentence reductions and home confinement. Section 3582(c)(1)(A)

contemplates sentence reductions for specific individuals, not the

---

[3] *See also, e.g.*, *United States v. Coles*, 2020 WL 1899562 (E.D. Mich. Apr. 17, 2020) (denied for 28-year-old inmate at institution with outbreak); *United States v. Okpala*, 2020 WL 1864889 (E.D.N.Y. Apr. 14, 2020); *United States v. Weeks*, 2020 WL 1862634 (S.D.N.Y. Apr. 14, 2020); *United States v. Haney*, 2020 WL 1821988 (S.D.N.Y. Apr. 13, 2020) (denied for 61-year-old with no other conditions); *United States v. Pinto-Thomaz*, 2020 WL 1845875 (S.D.N.Y. Apr. 13, 2020) (two insider trading defendants with less than a year to serve have no risk factors); *United States v. Korn*, 2020 WL 1808213, at *6 (W.D.N.Y. Apr. 9, 2020) ("in this Court's view, the mere *possibility* of contracting a communicable disease such as COVID-19, without any showing that the Bureau of Prisons will not or cannot guard against or treat such a disease, does not constitute an extraordinary or compelling reason for a sentence reduction under the statutory scheme."); *United States v. Carver*, 2020 WL 1892340 (E.D. Wash. Apr. 8, 2020).

widespread prophylactic release of inmates and the modification of

lawfully imposed sentences to deal with a world-wide viral pandemic.

Komoroski has not identified a medical condition that falls within

one of the categories specified in the policy statement's application note.

Komoroski asserts that he has chronic sleep apnea.  Although BOP

medical records (which are being filed under seal) support this

assertion, Komoroski's condition does not itself rise to the level of

severity required under the policy statement. Specifically, Komoroski

does not allege—and there is no evidence—that his sleep apnea

"substantially diminishes [his] ability . . . to provide self-care within the

environment" of his institution. USSG § 1B1.13, cmt. n.1(A)(ii).

Further, sleep apnea is not one of the conditions identified by the CDC

as increasing a person's risk for developing serious illness from COVID-

19. *See* Centers for Disease Control, *Groups at Higher Risk for Severe

Illness*, *available at* https://www.cdc.gov/coronavirus/2019-ncov/need-

extra-precautions/groups-at-higher-risk.html (last modified May 14,

2020). Chronic lung disease is listed as a CDC risk factor, but there is

no indication that sleep apnea falls within that category. *Id.* (listing as

examples of chronic lung disease "chronic obstructive pulmonary

19

disease (COPD) (including emphysema and chronic bronchitis), idiopathic pulmonary fibrosis and cystic fibrosis"); *see also United States v. Cooper*, 2020 WL 2064066, at *3 (D. Nev. Apr. 29, 2020) (concluding that sleep apnea does not, "even in the face of the COVID-19 pandemic, provide extraordinary and compelling reasons for [the defendant's] early release). Finally, Komoroski's medical records do not suggest that he is currently in poor health.  Nor has Komoroski alleged that he is currently in poor health.

Because Komoroski has failed to establish an "extraordinary and compelling reason" for a sentence reduction under § 3582(c), his motion should be denied.

## B.   The § 3553(a) Factors Weigh Against Komoroski's Release.

Alternatively, Komoroski's request for a sentence reduction should be denied because he has failed to demonstrate that he merits release under the § 3553(a) factors.

At the present time, it is apparent that, but for the COVID-19 pandemic, Komoroski would present no basis for compassionate release. The medical ailment he has identified is well-controlled and does not

present any impediment to his ability to provide self-care in the institution.

The only question, then, is whether the risk of COVID-19 changes that assessment. It does not. At present, Komoroski's medical condition is appropriately managed at the facility, which is also engaged in strenuous efforts to protect inmates against the spread of COVID-19, and would also act to treat any inmate who does contract COVID-19. The § 3553(a) factors, moreover, weigh against a sentence reduction. At Komoroski's sentencing earlier this year, the Court calculated a guideline range of 4 to 10 months. The Court selected a term of imprisonment within the middle of that range (7 months) based in large part on Komoroski's prior conviction for very similar conduct. Granting Komoroski's immediate release at this time would effectively result in a below-guideline sentence and would not adequately account for the history and characteristics of Komoroski, the need to promote respect for the law, and the need to afford adequate deterrence.

Accordingly, in light of Komoroski's record and the totality of relevant circumstances, this Court should deny his motion for a sentence reduction.

## III. The Court Has No Authority to Direct the BOP to Place Komoroski in Home Confinement.

Komoroski also appears to ask that the Court order BOP to place him in home confinement. Doc. 75, at 10-13. That request should be denied because the Court has no authority to direct BOP to place a defendant in home confinement. Rather, such designation decisions are committed solely to BOP's discretion.

Once a sentence is imposed, BOP is solely responsible for determining an inmate's place of incarceration. *See* 18 U.S.C. § 3621(b); *Moore v. United States Att'y Gen.*, 473 F.2d 1375, 1376 (5th Cir. 1973) (per curiam); *see also McKune v. Lile*, 536 U.S. 24, 39 (2002) (plurality opinion) ("It is well settled that the decision where to house inmates is at the core of prison administrators' expertise."). A court has no authority to designate a prisoner's place of incarceration. *United States v. Voda*, 994 F.2d 149, 151-52 (5th Cir. 1993). Because Komoroski's request for home confinement alters only the place of incarceration, not the actual term of incarceration, only BOP may grant or deny his request.

Moreover, there is no constitutional or statutory authority that allows the Court to order home confinement. A prisoner has no constitutional right to confinement in any particular place, including in home confinement. *See Sandin v. Conner*, 515 U.S. 472, 478 (1995) ("the Due Process Clause did not itself create a liberty interest in prisoners to be free from intrastate prison transfers."); *Meachum v. Fano*, 427 U.S. 215, 224 (1976) ("The conviction has sufficiently extinguished the defendant's liberty interest to empower the State to confine him in *any* of its prisons."). Following the imposition of sentence, the Court has limited jurisdiction to correct or modify that sentence absent specific circumstances enumerated by Congress in 18 U.S.C. § 3582. *United States v. Garcia*, 606 F.3d 209, 212 n.5 (5th Cir. 2010) (per curiam). Section 3582(c) contemplates only a reduction in sentence. *See* § 3582(c). But Komoroski's request to serve the rest of his term in home confinement, as opposed to prison, works no reduction to his sentence. Home confinement merely permits the inmate to serve out his term of imprisonment at home. Komoroski's request for such relief therefore falls outside § 3582(c)'s limited grant of authority to this Court to modify a sentence post-conviction. Because § 3582(c) deprives the Court

23

of jurisdiction to grant home confinement and because Komoroski offers

no other statutory authority to support his request for such relief,[4] the

Court has no authority to act on his request for such relief in this

forum.[5] *See Moore-Brown*, 2020 WL 2306855, at *6 ("[I]nsofar as

defendant is challenging any decision by the BOP that he is not eligible

for home confinement designation under the CARES Act, the court will

---

[4] The Government is aware that when ruling on motions similar to Komoroski's, the Court has construed the motions as § 2241 petitions and ordered their transfer to the districts of confinement. *E.g.*, *Moore-Brown*, 2020 WL 2306855. The Government has opposed this approach in at least one case pending before the Court. *United States v. Tirado*, No. 00-cr-133, Doc. 711.  Komoroski has not attempted to invoke jurisdiction under § 2241.  The Government therefore requests that the Court not construe his motion has a § 2241 petition. The Government can provide additional briefing on this issue at the Court's request.

[5] If a court grants a sentence reduction, it may "impose a term of . . . supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment." § 3582(c)(1)(A). In imposing a term of supervised release, the court may impose a period of home confinement as a condition of supervised release, provided that the court finds that home confinement is a "substitute for imprisonment." USSG § 5F1.2; *see* 18 U.S.C. § 3583(d). Alternatively, a court may consider modifying an existing term of supervised release to add a period of home confinement, consistent with USSG § 5F1.2. *See* § 3583(e)(2).

dismiss it since the authority to make this determination lies with the

BOP Director and not the court.").

## CONCLUSION

The Court should deny Komoroski's motion for a sentence

reduction without prejudice for failure to exhaust administrative

remedies or, in the alternative, deny the motion on the merits.[6]

_____

[6] If the Court elects to grant Komoroski's motion, then the Government
requests that the Court accommodate the need to quarantine
Komoroski for a period of at least 14 days in order to protect public
health. The Government requests that the Court retain jurisdiction over
the motion for 14 days if it makes a determination to grant release,
while advising the parties of that decision. BOP will then place the
inmate in quarantine. If Komoroski has not displayed symptoms or
tested positive for COVID-19 for a period of 14 days, the Court can then
order release. If Komoroski tests positive during the initial 14-day
period, the Government will notify the Court and seek an extension of
the release date until Komoroski has displayed no symptoms for a
period of 14 days.

Dated:  May 28, 2020                    Respectfully submitted,

                                        DAVID J. FREED
                                        United States Attorney

                                        /s/ Carlo D. Marchioli
                                        Carlo D. Marchioli
                                        Assistant U.S. Attorney
                                        PA 309217
                                        228 Walnut Street, Suite 220
                                        P.O. Box 11754
                                        Harrisburg, PA  17108
                                        Tel:  (717) 221-4482
                                        Fax:  (717) 221-4493
                                        carlo.d.marchioli@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

I certify that on May 28, 2020, I served the foregoing document by

U.S. mail on the following individual:

Mark Komoroski
14640-067
FCI Schuylkill
P.O. Box 670
Minersville, PA  17954


<u>/s/ Carlo D. Marchioli</u>
Carlo D. Marchioli
Assistant U.S. Attorney