UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF PENNSYLVANIA

UNITED STATES

V.

MARK KOMOROSKI,

Defendant.

Case Number: 3:17-CR-156

(Judge Mannion)

FILED
SCRANTON

JUL 27 2020

PER _____ DEPUTY CLERK

**Defendant's Brief in Support of Second Emergency Motion for Compassionate Release**

Affidavit and declaration under penalty of perjury of the Defendant, Mark Komoroski:

I, Mark Komoroski, hereby certify and declare, under penalty of perjury, that the following is true and correct. Executed this 24th day of July, 2020, by the undersigned movant, Mark Komoroski:

1

The coronavirus COVID-19 has entered the federal prison where the defendant movant is incarcerated. As of July 23, 2020, the website of the Federal Bureau of Prisons, BOP.gov/coronavirus/, declares: there is 1 "confirmed active case" (a prisoner) infected with the deadly coronavirus COVID-19 at the federal prison where the movant is presently incarcerated, FCI Schuylkill, in Minersville, PA. We know if one prisoner is infected, then most likely many more prisoners are infected. In the tiny confines of the crowded prison, it is most likely many prisoners, including the movant, either have been or will be exposed to the deadly coronavirus that is now present in the prison.

The situation is thus now truly life-threatening for the prisoner movant. He is now facing his worst nightmare in prison. He is held without his life-saving CPAP machine, in a prison, FCI Schuylkill, where he has been told he will be held, upon personal order of the Warden, until his sentence is completed in October of 2020.

The virus has invaded the prison. It has reached into one of the prisoners. There is scant testing, no social distancing, and woefully inadequate sanitation at the prison.

The BOP, on June 15, 2020, informed the movant he had been granted release to home confinement, pursuant to the CARES Act, due to the prisoner's heightened susceptibility to death from the coronavirus because he suffers from chronic lung disease. He suffers from severe obstructive sleep apnea, which places him at highest risk of death, according to the criteria established by the Centers for Disease Control, if he becomes infected with the coronavirus that has already infected a prisoner at the prison where he is incarcerated. See: Sleep Study of Mark Komoroski, conducted at the Wilkes-Barre General Hospital Sleep Disorder Center, diagnosing the defendant as

suffering from "severe obstructive sleep apnea," and prescribing the life-saving CPAP ventilator machine as necessary for treatment. (Exhibit).

But the Warden countermanded the order from the Federal Bureau of Prisons (BOP) that the prisoner movant is granted compassionate release. Now, with his compromised lungs, the prisoner struggles for breath each night, because the Warden, in retaliation for the prisoner's exercise of his First Amendment right to bring this action before this Court, ordered the prisoner movant is henceforth not allowed to have the use of his life-saving CPAP (continuous positive air pressure) ventilator machine. The Warden ordered that instead of being granted compassionate release under the CARES Act ordered by the BOP, the prisoner must serve the entirety of his sentence, till his release in October of 2020, in the "Hole" at the maximum security federal prison FCI Schuylkill, in Minersville, PA, bereft of his life-saving CPAP machine.

The prisoner movant is being offered up by the Warden as a human sacrifice to the virus. The prisoner's only possible rescue comes from this Court. The Warden of his prison has countermanded the order of the BOP that the movant be granted a form of compassionate release, pursuant to the CARES Act. Only this Court can save the life of the prisoner. We pray to God the Court acts to provide compassionate release to the prisoner before the issue is mooted by the death of the prisoner from infection with the virus or the prisoner's death by suffocation caused by the Warden's denial of the prisoner's life-saving CPAP machine.

The Warden of his prison imposed an illegal policy which barred the prisoner, and all other prisoners, at the minimum-security federal prison camp where he was incarcerated, from appealing the Warden's denial of their requests for compassionate

release through the BOP's grievance process. The prisoner movant exposed the Warden's malfeasance to this Court. This exposure incensed the Warden. In retaliation for the prisoner's exposure of the Warden's malfeasance—in retaliation for the Reply Brief filed by the movant in this Court—in retaliation for the prisoner's exercise of his First Amendment right to petition this Court for redress of grievances, the Warden countermanded the BOP's order to provide compassionate release to the deserving prisoner movant. In retaliation for the prisoner movant's offense of exposing the Warden's malfeasance to this Court, the Warden ordered the prisoner movant thrown into the "Hole," the Special Housing Unit (SHU), at the federal prison FCI Schuylkill, where the coronavirus has already infected one prisoner, and the Warden also ordered the prisoner defendant must henceforth be denied his life-saving CPAP machine.

The movant prays this Court grant the movant compassionate release, pursuant to 18 U.S.C. §3582(c)(1)(A), because he is in imminent danger of death through infection with the coronavirus COVID-19, which is present at his prison. The prisoner movant suffers from chronic lung disease, severe obstructive sleep apnea, which makes him particularly susceptible to dying from the virus if he becomes infected with the coronavirus that is now present at his prison. The prisoner movant prays this Court save his life by granting him immediate compassionate release to home confinement to serve the final two months of his sentence in quarantine so he may be safe.

This Court has graciously and generously allowed the defendant movant a second chance to try to persuade the Court the defendant deserves merciful compassionate release due to his susceptibility to injury and death from the coronavirus that has invaded the prison where he is imprisoned. The prisoner defendant suffers from severe

obstructive sleep apnea, a chronic lung disease that makes him especially susceptible to suffering injury and death from the coronavirus, because of his compromised lung function at night. He is imprisoned in a prison where the coronavirus is present. Since the coronavirus spreads like wildfire in nursing homes and prisons, it is most likely that many others at the prison are either presently infected or will soon become infected with the virus. Time is of the essence. The defendant prisoner prays the Court act quickly to save his life, by providing compassionate release to the defendant prisoner, immediately to home confinement, so his prison sentence does not transmute into a death sentence because of infection with the deadly coronavirus.

The Court has graciously allowed the defendant prisoner to reopen his motion for compassionate release. The movant hereby incorporates in this Brief in Support of Second Emergency Motion for Compassionate Relief the previous Emergency Motion for Compassionate Release and Reply he filed with the Court.

An important factor in the Court's judgment of this matter should be the fact that on or about June 15, 2020, the Federal Bureau of Prisons (BOP) granted the defendant prisoner release to home confinement pursuant to the emergency power granted to the Attorney General of the United States by the federal CARES Act, which empowers the Attorney General and the BOP to grant emergency home confinement to deserving prisoners who meet certain criteria and who are at high risk of injury and death from the coronavirus due to their suffering from comorbidity factors which place them at high risk of serious injury and death if they become infected with the coronavirus.

On June 15, 2020, the prisoner defendant was given official papers from the Federal Bureau of Prisons, which ordered he was to be placed on furlough on July 8, 2020. He

5

was to be picked up at the prison by his wife, Lecia, and transported by her to the Capitol Pavilion Residential Reentry Center halfway house in Harrisburg, PA, where he was then to be immediately transferred under the auspices of the halfway house to home confinement at his home in Nanticoke, PA.

This Court then ruled, on June 17, 2020, that the movant's petition for compassionate release was dismissed without prejudice.

In his Reply brief, made in Reply to the government's Response to the movant's emergency motion for compassionate release, the defendant movant exposed the corrupt practice established by the Warden of the federal prison where the prisoner is incarcerated—the order given by the Warden that henceforth no prisoner at the federal prison camp was allowed to appeal to the Regional Director of the BOP the Warden's denial of any prisoner's plea for compassionate release. In the BOP, to appeal the Warden's denial of a prisoner's Request for Administrative Remedy, the prisoner must first request and receive from his assigned prison Counselor a "BP-10," a form, titled "Regional Administrative Remedy Appeal," that allows the prisoner to appeal to the Regional Director of the BOP the Warden's denial of the prisoner's Request for Administrative Remedy. The prison counselor must initial the form with the counselor's initials, and give the form to the prisoner whose Request for Administrative Remedy has been denied by the Warden. If the Counselor refuses to give the form to the prisoner, then the prisoner is unable to appeal and is thwarted from appealing to the Regional Director of the BOP the Warden's denial of the prisoner's Request for Administrative Remedy.

In the case of the present petitioner, when the prisoner requested the "BP-10" form from his counselor, the counselor refused to give the prisoner the "BP-10" form necessary to appeal to the Regional Director of the BOP the Warden's denial of the prisoner's Request for compassionate release. Further, the counselor threatened the prisoner that, if the prisoner persisted in any way to seek compassionate release, whether through the administrative remedy procedure or otherwise, the Warden would retaliate against the prisoner for his attempt to exercise his First Amendment rights, by throwing the prisoner into the "Hole," the Special Housing Unit (SHU), which serves as a special prison within the maximum security federal prison adjacent to the federal prison camp.

The prisoner had filed his Request for Administrative Remedy with the Warden, seeking compassionate release. The prisoner's Request stated:

"DEAR MR. WARDEN, I AM ASKING YOU FOR COMPASSIONATE RELEASE BECAUSE OF THE COMPLICATIONS THAT MAY OCCUR IF THE VIRUS [COVID-19] GETS INTO THIS SYSTEM BECAUSE OF MY SLEEP APNEA."

On April 21, 2020, the Warden denied the prisoner defendant's Request for compassionate release. On or about April 22, 2020, the prisoner defendant asked his Counselor for the "BP-10" form required to appeal the Warden's denial to the Regional Director of the BOP, in order for the prisoner to be able to properly pursue the administrative remedy process, as required by law. The Counselor refused to give the prisoner the "BP-10" form necessary for his appeal of the Warden's denial of his Request for compassionate release. Then, from April 21, 2020, through April 28, 2020, the Counselor/Unit Manager held "town hall" public meetings with all prisoners at the

7

federal prison camp at Schuylkill, PA, where all prisoners at the camp were informed: (1) henceforth no prisoner would be allowed to file any further Request for Administrative Remedy seeking compassionate release; (2) no prisoner was henceforth allowed to file any appeal to the Regional Director of the BOP appealing the Warden's denial of the prisoner's Request for compassionate release, and (3) any prisoner who disobeyed those direct orders would be punished through retaliation, by being thrown into the "Hole," the Special Housing Unit (SHU), at the maximum security federal prison adjacent to the camp, the federal prison known as FCI Schuylkill, in Minersville, PA.

The prisoner defendant was thus physically prevented, by action of the Warden and prison camp Counselor, from being able to appeal to the Regional Director of the BOP the Warden's denial of his Request for compassionate release. The prisoner defendant then brought his Emergency Motion for Compassionate Release with this Court.

On July 2, 2020, the Warden made good his promise to retaliate against the defendant prisoner for his exercise of his First Amendment right to ask the Court for compassionate release. Most specifically, the Warden retaliated against the defendant because the defendant exposed the corruption of the Warden. The defendant, through his Reply brief filed with this Court, exposed the fact the Warden is operating as a rogue agent of the BOP. The defendant exposed the fact the Warden had extinguished the administrative remedy process which is the heart and soul of the BOP's grievance process.

Subsequent to the defendant petitioner's filing of his motion for compassionate release with this Court, the BOP independently decided that, pursuant to the CARES Act, the defendant petitioner must be released to home confinement, because his

suffering from chronic lung disease makes him particularly susceptible to injury and death from the coronavirus, were he to become infected in the confines of a federal prison, where social distancing and proper sanitation and protection from infection with the coronavirus is nigh impossible. Thus the BOP independently granted the defendant release to home confinement, pursuant to the CARES Act, which empowers the Attorney General to provide release to home confinement for prisoners vulnerable to infection, who meet certain criteria. The prisoner defendant, a prisoner at a minimum-security federal prison camp, who suffers from chronic lung disease that places him at high risk of death if he contracts the coronavirus in prison, ably meets all the criteria, and thus the BOP ordered his release to home confinement. On June 15, 2020, the prisoner received official papers from the BOP certifying his imminent release on July 8, 2020 from prison to home confinement. On June 15, 2020, he exultantly wrote to his wife, telling her the good news that the BOP had given him the papers approving his release to home confinement due to his susceptibility to injury and death from infection with the coronavirus due to his suffering from chronic lung disease.

The prisoner's wife, Lecia, then coordinated with the authorities at the halfway house in Harrisburg, PA, where the prisoner was ordered by the BOP to report on July 8, 2020, when he was to be released from prison. There, at the halfway house, the halfway house would take custody of the prisoner, and immediately release him to home confinement under the auspices of the halfway house, which operates under contract with the BOP. On July 8, 2020, he would be home in his house in Nanticoke, PA, where he would be able to totally quarantine under the supervision of his daughter Klah, who is a licensed nurse.

At this point the case of the defendant becomes eerily similar to the recently decided case of Michael D. Cohen v. William Barr, et al, recently decided in the United States District Court for the Southern District of New York, in case number 20 Civ. 5614 (AKH). In Cohen v. Barr, decided July 23, 2020, Judge Hellerstein ordered the prisoner immediately released to home confinement from his imprisonment in the "Hole," where prisoner Cohen had been placed when he had the temerity to exercise his First Amendment rights, analogous to the situation presented in the present case. In Cohen v. Barr, supra, Judge Hellerstein ordered the prisoner immediately released to home confinement because the BOP's purpose in sending Cohen back to prison, after the prisoner had been granted release to home confinement pursuant to the CARES Act because he suffered from respiratory problems, "was retaliatory in response to Cohen desiring to exercise his First Amendment rights to publish a book critical of the President." Cohen v. Barr, supra, Order of the Court, of July 23, 2020.

In the present case, the Warden of the federal prison where the prisoner is incarcerated became wroth with the prisoner when the prisoner published his Reply Brief with this Court. The Warden was ordered by the BOP to release the prisoner to home confinement. Instead, the Warden made good his threat of retaliation. In retaliation for the prisoner's exercise of his First Amendment right to publish his Reply brief with this Court, the Warden ordered the prisoner be thrown into the "Hole." A phony disciplinary "shot" against the prisoner was fabricated, just as the BOP fabricated the false disciplinary claim that Cohen had committed an offense which justified his being thrown into the "Hole." See: Memorandum of Law in Support of Petitioner's Emergency Motion for a Temporary Restraining Order, in Cohen v. Barr, supra, Case

1:20-cv-05614-AKH, Document 5, filed July 20, 2020, in the United States District Court for the Southern District of New York.

The chief differences between the analogous case of Cohen v. Barr, supra, and the case of the present defendant are: (1) the fact Cohen had been released and was being re-imprisoned, and (2) the fact Cohen has high-powered lawyers to argue his case.

In the case of the present defendant, the BOP ordered the prisoner released to home confinement, exactly as Cohen received a form of compassionate release to home confinement pursuant to the CARES Act. But then, in the case of the present defendant, the Warden intervened and countermanded the BOP order that the prisoner be released to home confinement. The Warden threw the prisoner in the "Hole," canceled the prisoner's imminent release from prison, and is presently trying to murder the prisoner through denial of his life-saving CPAP machine, all in retaliation against the prisoner because the prisoner had the temerity to exercise his First Amendment right to inform this Court of the Warden's malfeasance.

In the case of Cohen v. Barr, supra, when Cohen suffered similar retaliation for his exercise of his First Amendment rights, Cohen's high-powered lawyers immediately filed a habeas motion pursuant to 28 U.S.C. Section 2241, and an Emergency Motion for a Temporary Restraining Order, pursuant to Federal Rule of Civil Procedure 65, seeking an order from the Court that the BOP must immediately release the prisoner to home confinement.

In Cohen v. Barr, supra, Judge Hellerstein ordered the immediate release of the prisoner to home confinement, pursuant to 28 U.S.C. Section 2241, granting Cohen's

concomitant Motion, pursuant to Federal Rule of Civil Procedure 65, for a temporary restraining order and a preliminary injunction ordering the Warden, the BOP and the Attorney General to immediately release the defendant to home confinement.

In the present case, exhaustion of administrative remedies, concerning the movant's Request for compassionate release from the Warden, has been denied to the prisoner by order of the Warden. This is because the Warden prohibited the movant prisoner from being able to appeal to the Regional Director of the BOP the Warden's denial of the prisoner's Request for compassionate release, by prohibiting the Counselor from giving to the prisoner the "BP-10" form necessary to appeal, and by threatening retaliation—retaliation the Warden now has accomplished.

The prisoner has now suffered and is suffering assault at the hands of the Warden, in direct retaliation for his exercise of his First Amendment right to petition the government for redress of grievances—in direct retaliation for his filing of his Reply Brief with this Court, a Reply Brief that exposed the malfeasance of the Warden. The malfeasance of the Warden was exposed by the movant through his Reply Brief, which explained how the Warden denied the prisoner and other prisoners their right to use the administrative remedy process to appeal the Warden's denial of their Requests for compassionate release.

By order of the Warden, the prisoner is now denied his release to home confinement ordered by the BOP pursuant to the CARES Act; by order of the Warden, the prisoner is held in the "Hole" at the federal prison at Schuylkill, PA; by order of the Warden, the prisoner is denied the use of his life-saving CPAP machine; by order of the Warden, the prisoner has been informed, by prison authorities, he will be held in the "Hole," without

his life-saving CPAP machine, in a prison where the coronavirus is present, until the expiration of his prison sentence on October 4, 2020.

The Third Circuit Court of Appeals has carefully delineated, in Rinaldi v. United States, 904 F.3d 257, 266 et seq. (3d Cir. 2018), the test we must employ to decide when an administrative remedy is not available because the prison authorities have engaged in the egregious misbehavior delineated in this case. In Ross v. Blake, 136 S.Ct. 1850, 1859-60, 195 L.Ed.2d 117 (2016), the Court teaches us one of the "kinds of circumstances in which an administrative remedy, although officially on the books," is not "available," because it is "not capable of use to obtain relief," is when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." (Quoted with approval by the Third Circuit Court of Appeals in Rinaldi v. United States, 904 F.3d 257, 266 (3d Cir. 2018)).

The prisoner is presently the victim of a retaliatory assault perpetrated by the Warden. The prisoner has been told by prison authorities he will be held in the "Hole," at the maximum-security federal prison at Schuylkill, PA, without his life-saving CPAP machine, until the termination of his sentence on October 4, 2020—a prison where the deadly coronavirus is now present. The prisoner has been told by prison authorities his punishment has been ordered personally by the Warden and there is absolutely nothing the prisoner can do to gain redress of grievances through the prison grievance system.

The prisoner is not allowed to have his life-saving CPAP machine. He puts in the window of his cell a sign saying "I can't breathe!" The sign is ignored. He begs the prison authorities for his CPAP machine. His cries for mercy are ignored. He is being punished, on order from the Warden, with denial of his BOP-ordered compassionate

release to home confinement under the CARES Act, because he had the temerity to inform this Court of the Warden's malfeasance. He is facing infection from the coronavirus which is present at the prison where he is imprisoned. He is presently suffering retaliation for his prior exercise of his First Amendment right to file a petition with this Court.

The Third Circuit Court of Appeals teaches us, in Rinaldi, 904 F.3d at 267: It is "difficult to accept the proposition that an administrative remedy is available in any meaningful sense if its use will result in serious retaliation and bodily harm." 904 F.3d at 267, quoting with approval Tuckel v. Grover, 660 F.3d 1249, 1253 (10th Cir. 2011).

In Rinaldi, 904 F.3d at 269, the Third Circuit Court of Appeals holds: "To defeat a failure-to-exhaust defense, an inmate must show (1) that the threat was sufficiently serious that it would deter a reasonable inmate of ordinary firmness and fortitude from lodging a grievance and (2) that the threat actually did deter this particular inmate."

In the present case, we have much more than a threat. We have the prison authorities, on order of the Warden, making good on the Warden's threat to retaliate against the prisoner for his exercise of his First Amendment rights. In this case, the Warden and the Counselor first physically denied the defendant access to the grievance process, by physically denying him the form necessary to appeal to the Regional Director of the BOP the Warden's denial of his Request for compassionate release. That total denial of access to the grievance process is much more egregious than the simple threat contemplated in Rinaldi, supra.

Then, the Warden made good on his threat to retaliate against the prisoner. In this case, the Warden believes he is above the law. The prisoner's only hope for salvation is through this Court.

Therefore, the prisoner defendant respectfully moves this Court grant the prisoner compassionate release to home confinement.

The deadly coronavirus is now in the prison where the prisoner is presently held. According to the BOP's website, the coronavirus is also at the federal prisons at Loretto, PA (8 inmates confirmed infected; 2 staff); Allenwood, PA (1 staff member confirmed infected); Canaan, PA (1 staff member confirmed infected); FDC Philadelphia, PA (1 inmate confirmed infected; 2 staff members infected). At the federal prison at Elkton, Ohio, only 15 miles from the Pennsylvania border, 9 prisoners died from the coronavirus. At Elkton, 50 corrections officers tested positive and 2 ended up on ventilators; 582 prisoners have recovered from the virus; there were 277 active cases as of July 3, 2020. Source: Cleveland.com, July 3, 2020.

As of July 23, 2020, the BOP website declares: "**4,353 federal inmates** and **397 BOP staff** . . . have confirmed positive tests for COVID-19 nationwide. Currently, **5,676** inmates and **648** staff have recovered. There have been **99** federal inmate deaths and **1** BOP staff member death attributed to COVID-19 disease." (Emphasis in original). The BOP website then further declares: "**Positive Tests**: 10,051 (Number of inmates that have ever had a positive test)." (Emphasis in original).

The BOP website further declares: "Since the release of the Attorney General's original memo to the Bureau of Prisons on March 26, 2020 instructing us to prioritize

15

home confinement as an appropriate response to the COVID-19 pandemic, the BOP has placed **7,086** inmates on home confinement." (Emphasis in original).

The prisoner movant was ordered by the BOP to be one of those 7,086 prisoners released to home confinement, because as a prisoner at a minimum-security federal prison camp who suffers from chronic lung disease, who is in danger of infection from COVID-19, he meets all the BOP criteria for early release to home confinement. But the Warden became wroth at the prisoner, because the prisoner movant had the temerity to expose the malfeasance of the Warden before this Court. The Warden retaliated against the prisoner for the prisoner's exercise of his First Amendment right to inform this Court of the malfeasance of the Warden. The prisoner informed this Court the Warden denied the prisoner and other prisoners their right to appeal to the Regional Director of the BOP the Warden's denial of their Requests for compassionate release. In retaliation for the prisoner's exercise of his First Amendment right before this Court, the Warden ordered the prisoner must serve the entirety of his sentence in the "Hole" at the maximum-security federal prison FCI Schuylkill, where the coronavirus is now present. The Warden further ordered the prisoner is henceforth not allowed to have his life-saving CPAP ventilator machine, which the prisoner needs as medical treatment for his severe obstructive sleep apnea.

The deadly coronavirus is now at the prison where the prisoner resides. The prisoner, who suffers from life-threatening severe obstructive sleep apnea, puts in his cell window every day his hand-written sign: "I can't breathe!" because he is denied his life-saving CPAP machine. The Warden is punishing the prisoner, in retaliation for the

prisoner's exercise of his First Amendment rights before this Court, with a sentence of possible death.

As of the writing of this brief, approximately 1,100 United States residents die each day from the lethal coronavirus COVID-19, which is rampaging like wildfire through our country. Approximately 145,000 US residents have already died from the virus. It can infect anyone. It can cause death in just a few days. Some healthy people become infected and die in just one week. Individuals who suffer from chronic lung disease, like the prisoner movant, are at highest risk of death if they become infected with the invisible virus. The coronavirus attacks the lungs. Individuals like the prisoner movant, who suffer from chronic lung disease, often stand little chance of survival if they become infected with the virus. At the federal prison at Elkton, Ohio, close to the Pennsylvania border, a massive outbreak has spread through the prison, taking 9 prisoners' lives.

As punishment for his exercise of his First Amendment rights before this Court, the Warden has ordered the prisoner must spend the entirety of the rest of his sentence in the "Hole," the Special Housing Unit (SHU), at the federal prison FCI Schuylkill, where the coronavirus is now present. In the "Hole," it is impossible for a prisoner to accomplish the sanitation methods promulgated by the Centers for Disease Control to prevent infection with the coronavirus. In the Hole, prisoners are allowed only 3 showers a week. There is no hot water in the cell for proper frequent hand washing. The water dribbles out of a faucet that works only when a button is continuously pressed by the prisoner's hand. There is no way to wash one's hands without contamination. Prisoners are often forced to live with 2 or 3 other cell-mates in a tiny cell designed for 2 to live, packed together like sardines into a tiny space, with one or 2 cell-mates forced to sleep

on the floor, with their heads on the floor close to the toilet. It is impossible to practice social distancing. Prisoners are forced to share the same roll of toilet paper. It is impossible to practice proper hand-washing in such an environment. Preventing infection from the coronavirus is thus nigh impossible in the prison where the virus has entered.

The Warden has ordered the prisoner is not allowed to have the use of his life-saving CPAP machine in the "Hole." The prisoner has been told by prison authorities he will henceforth never be allowed the use of his CPAP machine, on personal order of the Warden.

The defendant movant prays this Court find the defendant is deserving of compassionate release to home confinement, because he suffers from severe obstructive sleep apnea, a chronic lung disease, which puts him at high risk of death from the coronavirus COVID-19 presently infecting the prison where he resides. He is further at risk of death because he is denied his life-saving CPAP machine.

The defendant movant prays this Court order the movant is immediately released to home confinement as compassionate release, to save his life.

Respectfully submitted by the defendant,

Mark Komoroski

Executed this 24th day of July, 2020, by the undersigned: Mark Komoroski

_/s/ Mark Komoroski_  7/26/2020